UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, <br><br> Plaintiff, <br><br> v. <br><br> CHEVRON ORONITE CO. LLC, et al., <br><br> Defendants. | No. 2:21-cv-01737-DJC-JDP <br><br><br> <u>ORDER</u> |

This action is one of two Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") enforcement actions in this Court filed by the California Department of Toxic Substances Control ("DTSC") and the Toxic Substances Control Account ("TSCA")[1] related to former landfill sites managed by the IT Environmental Liquidating Trust ("ITELT").[2] Before the Court is a Motion for

---

[1] Plaintiff TSCA is an account within the State of California General Fund that may be used by the DTSC to fund response costs. (Pl's Mot. at 2.) Plaintiff TSCA must be a party to this action under California law, even though Plaintiff DTSC appears to be the main plaintiff in this action. (*Id.*) Plaintiff DTSC and Plaintiff TSCA will be jointly referred to as "Plaintiffs" for purposes of this order.

[2] The ITELT was established to oversee the long-term post-closure operation and maintenance of several landfill sites following the bankruptcy of IT Corporation, the former owner and operator of these facilitates. (First Am. Compl. (ECF No. 38) ¶ 31.) The other CERLCA suit filed by the Plaintiffs and pending before this Court is *California Department of Toxic Substances Control v. Exxon Mobil Corporation, et al.*, No. 2:21-cv-01737-DJC-JDP. Plaintiffs have filed a Motion for Approval and Entry of Consent Decree in that action as well. This order and an order in the other ITELT case will be issued simultaneously.

1

Approval and Entry of a Consent Decree entered into by DTSC and named Defendants who disposed of hazardous waste at a landfill located in Rio Hills, California. After a careful review, the Court finds that the Consent Decree is fair and reasonable, and GRANTS DTSC's Motion for Approval and Entry.

## I. Background

### A. Factual Background

Plaintiffs filed this action seeking declaratory relief and the recovery of "response costs" under 42 U.S.C. § 9607(a) of CERCLA in connection with the prior and potential future releases of hazardous substances at the Montezuma Hills Facility. (Pl's Mot. (ECF No. 43) at 1.) The Montezuma Hills Facility is a "former hazardous waste and solid waste landfill" located in Rio Vista, California that closed in 1986. (*Id.* at 3.) The Montezuma Hills Facility "managed and disposed of" hazardous waste between at least 1979 and 1986. (*Id.* at 3.) Plaintiffs claim the 17 Defendants to this action and their affiliates disposed of hazardous waste at the Montezuma Hills Facility. (*Id.* at 2.) Plaintiffs claim that the management of the hazardous waste at this location "resulted in releases of hazardous substances that are present in the soil, soil vapor, and groundwater at the [Montezuma Hills] Facility." (*Id.* at 3.) A certification of the Montezuma Hills Facility's closure was accepted by the DTSC on March 18, 1992. (*Id.*)

Until May 1, 2004, the Montezuma Hills Facility was operated by the IT Corporation. (*Id.*) After the IT Corporation underwent bankruptcy, the ITELT was created to act as operator of the Montezuma Facility and provide ongoing oversight of the post-closure operations and maintenance. (*Id.*) ITELT's post-closure responsibilities included "routine inspections, maintenance and compliance activities, recovery and management of groundwater, leachate, and soil vapor, long-term groundwater, leachate and soil vapor monitoring, soil vapor and water quality sampling and reporting, and response to potential and immediate threats, newly identified releases, and emergency contingencies such as floods, fires, and

////

earthquakes." (*Id.* at 4.) ITELT was also required to provide adequate financial assurances for these operations. (*Id.*)

On February 29, 2016, Plaintiff DTSC issued a "summary of violations" to ITELT "stat[ing], among other things, that the Facility was in violation of the financial assurance requirements because ITELT's financial assurance was underfunded and less than the total post-closure cost estimate." (*Id.*)  ITELT responded by informing the DTSC that it did not have assets or mechanisms to get those assets to meet the financial assurance requirements. (*Id.*)  Plaintiff DTSC determined that ITELT's inability to meet these requirements would prevent "(a) actions ensuring the protectiveness of the landfill covers, (b) collection and treatment of groundwater and leachate, and (c) monitoring of the surrounding environment for impacts from hazardous waste and solid waste left in place at the [Montezuma Hills] Facility[,]" and informed ITELT and parties who had previously disposed of waste at the Montezuma Hills Facility (including Defendants) "that termination of [post-closure] activities would pose an imminent and substantial endangerment to human health, the public, and the environment." (*Id.*)  Plaintiff DTSC then engaged in response actions that, as of December 31, 2022, allegedly cost DTSC $816,259.03. (*Id.* at 5.)

In filing this action Plaintiffs seeks past costs for Plaintiff DTSC's response at the Montezuma Hills Facility as well as a declaratory judgment that Defendants are liable[3] for future costs Plaintiff DTSC will incur addressing the release of or threatened release of hazardous waste. (*Id.* at 6.)  Pursuant to a settlement between the Parties, Plaintiffs now request the Court approve and enter the Proposed Consent Decree previously lodged with the Court. (Proposed Consent Decree (ECF No. 39-1).)  The Defendants jointly do not oppose the present motion (Notice of Pl's Mot (ECF No. 43) at 2–3) and are signatories to the Proposed Consent Decree (Pl's Mot. at 1 n.1).

---

[3] Under CERCLA, parties that are responsible for disposing hazardous waste are generally jointly and severally liable for the costs associated with the management of that waste. *Arizona v. City of Tucson*, 761 F.3d 1005, 1011 (9th Cir. 2014).

### B. Proposed Consent Decree

The Proposed Consent Decree has been agreed to and signed by all parties. (See Proposed Consent Decree at 40–57.) For purposes of the Consent Decree, DTSC estimated that post-closure activities will amount to $29,564,801 over the next 500 years. (Pl's Mot. at 5.) Under the terms of the agreement, the "Settling Defendants" are split into two groups: the Participating Parties and the Cashout Parties, each with a different set of obligations. (Proposed Consent Decree at 9, 14.)

The Participating Parties will be required to establish a Qualified Settlement Fund ("QSF") which shall be responsible for funding the future costs of operating the Montezuma Hills Facility. (*Id.* at 9.) A Non-Qualified Settlement Fund ("Non-QSF") will also be established by the Participating Parties. (Qualified Settlement Fund Agreement (ECF No. 39-1, App. B) at 2–3.) Where the QSF is intended to hold settlement funds required by the Proposed Consent Decree, the Non-QSF is designated "to hold and disburse any Settlement Funds received in connection with the Consent Decree that cannot be placed into the QSF, including, but not limited to, revenue generated at the Facility if applicable, together with any investment returns on such Non-QSF funds." (*Id.*) The QSF and Non-QSF will provide a continual source of funding for the ongoing operation of the Montezuma Hills Facility. (Pl's Mot. at 9–10.) The principal of the QSF – $8,197,543 – will remain constant over the duration of the consent decree and any return on the investment of the principal funds will be used to pay the annual expenses of the Montezuma Hills Facility. (Pl's Mot. at 8–9.)

The Participating Parties, which have collectively contributed the majority of the waste, will be required to make an initial payment into the QSF of $1,000,000. (Proposed Consent Decree at 11.) The Participating Parties will also be responsible for making additional payments into the QSF "in the following circumstances: (1) if the amount of the non-principal in the QSF plus the cumulative net return on investment is less than the annual expenses budgeted for the Facility for the upcoming fiscal year; (2) if unanticipated expenses or contingencies occur and available amounts in the QSF

4

or Non-QSF are insufficient to pay such costs; (3) if principal was used to pay for contingencies in the prior fiscal year; or (4) if the amount of principal is less than the cumulative amount of the settlement funds over a five year period." (Pl's Mot. at 9; *see* Proposed Consent Decree at 12–13.) The Participating Parties will also be required to pay "no less than $388,798.51" of Plaintiff DTSC's past response costs as well as any future response costs incurred by Plaintiff DTSC that are "(a) associated with any work takeover initiated by DTSC, (b) incurred to address alleged noncompliance with the Consent Decree, or (c) incurred in connection with the pursuit of non-settling potentially responsible parties." (Pl's Mot. at 9–10; Proposed Consent Decree at 12–13.) Finally, the Proposed Consent Decree imposes a number of ongoing obligations on the Participating Parties including "to (1) assure a facility operator is in place to perform the Facility work, (2) demonstrate adequate and available funding for the financial assurance required by California Code of Regulations title 22, § 66264.145 or any then-existing regulations (i) no later than one-hundred- twenty days after the Consent Decree effective date, and (ii) when the financial assurance amount is reevaluated by DTSC, and (3) assure that an appropriate settlement funds manager is in place to manage and administer the QSF and Non-QSF." (Pl's Mot. at 10–11; Proposed Consent Decree at 18–19.)

The Cashout Parties' obligations are comparatively simple: based on a "Cashout Schedule" set by the Proposed Consent Decree, each of the Cashout Parties will pay an amount into the QSF. (Proposed Consent Decree at 11; *see* Payment Calculation of Cashout Parties (ECF No. 39-1, App. C-1) at 1.) The total amount to be paid into the QSF by the Cashout Parties will be $7,197,543. (Pl's Mot. at 11.)

After agreeing to the terms of the Consent Decree, DTSC invited public opinion by publishing a notice of Proposed Consent Decree on its website and in multiple newspapers, and making the complete Proposed Consent Decree available to the public "at the DTSC Regional Center File Room in Sacramento, California and on DTSC's online EnviroStor database." (*Id*. at 13–14.) DTSC has received no comments,

much less any opposition, from any member of the public or any other potentially responsible party. (*Id.*)

Plaintiffs now move the Court for approval and entry of the Proposed Consent Decree. (Mot. (ECF No 43).) None of the Defendants have opposed the Motion. At the Court's own request, the Parties filed a supplemental brief providing more information about the financial commitment and financial risks the Participating Parties would be assuming. (*See* Supplemental Brief (ECF No. 46).) The matter was submitted without oral argument pursuant to Local Rule 230(g).

## II.     Legal Standard

"In order to approve a CERCLA consent decree, a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1011–12 (9th Cir. 2014) (quoting *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir.1995)). Once a consent decree is entered, the settling parties are protected from contribution claims from non-settling parties. *United States v. Aerojet Gen. Corp*, 606 F.3d 1142, 1147 (9th Cir. 2010); 42 U.S.C. § 9613. Thus, a district court has an "obligation to independently scrutinize the terms of [the agreement]," *Montrose*, 50 F.3d at 748, and "gauge the adequacy of settlement amounts to be paid by settling [parties]." *Arizona*, 761, F.3d at 1012 (quoting *States v. Charter Int'l Oil Co.*, 83 F.3d 510, 515 (1st Cir.1996)). While federal agencies are afforded significant deference, a court may only grant "some deference" to a state agency's expertise as to the environmental issues. *Id.* at 1014–15. A state agency is not entitled to any deference as to its interpretation of federal law or its finding that the consent decree is fair and reasonable. *Id.*

## III.    Discussion

### A. Procedural Fairness

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining

balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990); *accord California Dep't of Toxic Substances Control v. Allen's Formal Wear, Inc.*, No. CV-13-5069-GHK-JCG, 2016 WL 5936888, at *2 (C.D. Cal. Aug. 12, 2016); *Ariz. ex rel. Woods v. Nucor Corp.*, 825 F. Supp. 1452, 1456 (D. Ariz. 1992). The court may consider whether the settling parties contributed the bulk of the waste, the opportunity of the parties to participate in arm's length negotiations, whether the parties were represented by counsel, and whether any of the defendants, including non-settling defendants, objected to the consent decree. *See Dep't of Toxic Substance Control v. Technichem, Inc.*, No. 12-cv-5845-CRB, 2013 WL 3856386, at *3 (N.D. Cal. July 24, 2013); *California Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, No. 2:14-595-WBS-EFB, 2015 WL 7188230, at *2 (E.D. Cal. Nov. 16, 2015); *United States v. Andruss Fam. Tr.*, No. 07-cv-6873-ABC-RC, 2011 WL 1334391, at *2 (C.D. Cal. Apr. 7, 2011); *California Dep't of Toxic Substances Control v. Allen's Formal Wear, Inc.*, No. 13-cv-5069-GHK-JCG, 2016 WL 5936888, at *2 (C.D. Cal. Aug. 12, 2016). Where the decree results from "'good faith, arms-length negotiations,' it is 'presumptively valid and [an] objecting party has a heavy burden of demonstrating the decree is unreasonable.'" *See Technichem, Inc.*, 2013 WL 3856386, at *2 (citing *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990)).

     Here, the Proposed Consent Decree appears procedurally fair. The settling Defendants which are signatories to the Proposed Consent Decree have contributed the majority of the waste at the Facility, around 88.78%, meaning that most of the potentially liable parties participated in the settlement discussions and the agreement. (Mot. at 2.) All parties are represented by experienced counsel.[4] Negotiations between the Parties purportedly lasted years and were conducted at arm's length. (*Id.*

---

[4] Plaintiff DTSC is experienced at litigating CERCLA claims and negotiating settlements in such cases. *See e.g.*, *California Department of Toxic Substances Control v. NL Industries Inc.*, No. 2:20-cv-11293-SVW-JPR, 2023 WL 6194098 (C.D. Cal. Aug 18, 2023); *California Department of Toxic Substances Control v. Allen's Formal Wear, Inc.*, No. 13-cv-5069-GHK, 2016 WL 5936888 (C.D. Cal. Aug. 12, 2016). The 17 named Defendants include numerous large corporate entities that are individually represented by experienced attorneys and firms.

at 15.) Moreover, Plaintiffs also took active steps to ensure the procedural fairness of the Proposed Consent Decree to non-parties and the general public by publishing a notice about the Proposed Consent Decree "in the California Regulatory Notice Register and in three different newspapers." (*Id.*; *see* Pl's Ex. A (ECF No. 43-2); Pl's Ex. B (ECF No. 43-3); Pl's Ex. C (ECF No. 43-4).) These postings all invited comment on the Proposed Consent Decree, but Plaintiffs did not receive any comments. (Pl's Mot. at 15.) Similarly, none of the parties to this action have objected to the Proposed Consent Decree, in part or in full. Therefore, the Proposed Consent Decree appears to have involved good faith, arms-length negotiations that resulted in a procedurally fair agreement. *See Technichem, Inc.*, 2013 WL 3856386, at *2.

**B. Substantive Fairness and Reasonableness**

To determine whether the terms of a consent decree are substantively fair and reasonable, the court must assess how the total costs are apportioned among the defendants while considering other factors like litigation risk and time saving. *See Montrose*, 50 F.3d at 747 ("'fair' and 'reasonable' are, by their very nature, comparative terms."). However, apportionment does not necessarily need to be exactly proportional to fault. *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014) ("[T]he potential for disproportionate liability is an integral and purposeful component of CERCLA"). The Court's role is not to determine "whether the settlement is one which the court itself might have fashioned, or considers as ideal. . . ." *Cannons*, 899 F.2d at 84. The apportionment must only be fair and reasonable in light of the specific circumstances and be "roughly correlated with[] some acceptable measure of comparative fault." *Id.* at 87; *Coeur d'Alenes Co.*, 767 F.3d at 877. For example, it may be fair and reasonable for an earlier settler to receive more favorable terms, including a disproportionate share of liability, in order to encourage settlement and avoid litigation costs. Because a later settler or non-settler would continue to be jointly and severally liable for the remaining costs, such a scheme would not be unfair or unreasonable to the state. *Cannons*, 899 F.2d at 92.

Here, the Proposed Consent Decree appears to establish a substantively fair and reasonable apportionment of costs and liability, taking into account the trade-offs and risks undertaken by both the Participating Parties and the Cashout Parties. The Cashout Parties will contribute roughly twice their share of liability: collectively they are paying $7,197,543 or roughly 24% of the estimated future operation costs, despite only contributing about 12% of the waste. (Pl's Mot. at 16.) The Cashout Parties have agreed to pay a premium in exchange for a full release from liability and finality. (*See id.*; Proposed Consent Decree at 23.) Unlike the Participating Parties, the Cashout parties are not assuming the risk for future response costs. The Cashout Parties' proportional share of the DTSC response costs, without a premium, is also factored into the total amount each party will pay. (Pl's Mot. at 11.)

The contribution from the Participating Parties appears at first blush to be comparatively low: the Participating Parties have contributed 76% of the waste, and their proportional share is therefore equal to $22,469,248.76 based on the estimated costs, but they are paying only $1 million upfront, or 3% of the total estimated costs. (*Id.* at 16.) However, the ongoing responsibility for managing the Montezuma Hills Facility and the financial risk in assuming response costs accounts for this significant discount in initial financial responsibility. (*Id.* at 7–10; Pl's Suppl. Br. (ECF No. 46) at 2–8.) The Participating Parties will be responsible for all future work required by the prior post-closure permit, including non-routine work; all future administrative fees, permit fees, and taxes; fees for the administration of the Qualified and Non-Qualified Settlement Funds; and any earthquake response costs over $3 million. (Pl's Suppl. Br. at 2–3, 6.) The Participating Parties will be responsible for demonstrating financial assurances of $5,388,337 (or more if subsequently required by state law) which are separate from the funds in the QSF. (*Id.* at 2-3.) The Participating Parties will also be responsible for replenishing the principal balance in the QSF if the funds are used. (*Id.*) Specifically, Plaintiffs estimate that the annual facility costs will be roughly $232,330 and that the return on investment from the QSF will only account for an

9

estimated $68,059.[5] (*Id.* at 5.)  The Participating Parties are thus expected to contribute an estimated $164,271 annually, or approximately 70% of yearly costs.  (*Id.* at 5.)

Based on the estimates, the Participating Parties are expected to pay approximately 70% of the future costs which is, as noted by Plaintiffs, "roughly correlated to the Participating Parties' collective 76.21% contribution of the total tonnage disposed of at the [Montezuma] Facility." (*Id.* at 5–6.)  The roughly 6% reduction in contribution is accounted for based on the ongoing and open-ended financial responsibilities of the Participating Parties as well as the risks the Participating Parties undertake via the Proposed Consent Decree.  Parties who assume open-ended financial and legal risks are often entitled to a discount whereas those who assume no ongoing responsibilities may be required to pay a premium.  *See Cannons*, 899 F.2d at 88 ("Common sense suggests that a [participating party's] assumption of open-ended risks may merit a discount on comparative fault, while obtaining a complete release from uncertain future liability may call for a premium." (citations omitted)).  Because the Participating Parties are assuming responsibility of managing the future post-closure operations of the Facility and are assuming the risk of future responses which may occur more frequently or be more costly than anticipated, the significant discount in the initial payment, and the discount in yearly costs, are fair and reasonable.

As one example of the ongoing responsibilities and financial risks faced by the Participating Parties, Plaintiffs note that none of the cost estimates include costs for "contingencies" such as natural disasters or "new releases of contaminants" from the Montezuma Hills Facility.  (Pl's Suppl. Br. at 6–7.)  These are costs that would be wholly taken on by the Participating Parties under the Proposed Consent Decree.  (*Id.*)

---

[5] As noted by Plaintiffs, these costs and returns are subject to the effects of inflation and/or deflation. (Pl's Suppl. Br. at 9–10.) Plaintiffs appear to have accounted for these effects to whatever degree possible, but these numbers remain estimates and the actual costs and returns may differ.

Plaintiffs also note that costs which are considered "expenses" including the cost to administer the QSF, "costs to acquire financial assurance mechanisms," and others, are also not included in the settlement cost estimates. (*Id.* at 6.) If the settlement funds are unable to pay for these expenses, the Participating Parties would also be expected to bear those costs. (*Id.*)

In addition, the Participating Parties will reimburse nearly half of the past response costs incurred by DTSC, collectively $388,798.51. (Mot. at 10.) Although DTSC will not be recovering the full costs, it is reasonable and fair for DTSC to settle for a lower amount in order to avoid further litigation. Moreover, DTSC may in the future collect the balance of response costs from the remaining waste contributors who are not parties to this agreement. (*Id.* at 12 –13.) Any non-settling party will be afforded similar settlement terms as the Cashout Parties, making the agreement fair to non-settling parties as well. Importantly, if adopted, the Proposed Consent Decree will obviate the need for future DTSC response actions and future litigation over this Facility.

On the whole, taking into account the level of risk assumed and trade-offs made by all Parties, the Proposed Consent Decree appears substantively fair and reasonable based on the apportionment of the costs to the parties and the rough correlation of those costs to the comparative fault of the parties.

### C. Consistency with CERCLA Objectives

Finally, a consent decree must also be consistent with the objective of CERCLA. The objectives of CERCLA are to (1) "ensure the prompt and effective cleanup of waste disposal sites," (2) "assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created," and (3) "foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 968, 971 (9th Cir. 2013).

////

The agreement would create a fund to support the ongoing operation of the Montezuma Hills Facility and ensure that funds are readily available for prompt response to any releases or threatened releases from the Facility moving forward. (Proposed Consent Decree at 11.) It also places clear responsibility for guaranteeing the operations of the Montezuma Hills Facility with the Participating Parties so as to ensure that these efforts do not lapse. (*Id.* at 10–14.)

The Proposed Consent Decree also ensures contribution from all of the Defendants and that such contribution will fully satisfy the costs of remedying the conditions at the Montezuma Hills Facility. (Pl's Mot. at 8–11.) The Cashout Parties will make significant financial contributions to this account, and the Participating Parties, which have contributed the majority of the waste, will ensure the account is replenished and cover future operation costs. (*Id.* at 9, 11.) If DTSC undertakes any future response actions, it will be reimbursed through the QSF. (*Id.* at 9–10.)

While the DTSC may not be fully reimbursed for past costs under the agreement as this depends on the funds available in the QSF and non-QSF, the agreement does provide that the DTSC will receive some reimbursement for those past costs and ensures that any future costs will be funded by the parties. The Proposed Consent Decree also helps the parties to avoid complicated litigation that would be undoubtedly lengthy and costly given the 17 parties, along with their affiliates, that are involved in this action. In addition, as part of the Consent Decree, the Defendants have agreed to dismiss a writ action filed against the DTSC for other administrative actions related to the Facility. (Proposed Consent Decree at 2–3, 33.) The objectives of CERCLA are satisfied by the entry of a consent decree, signed and agreed to by all parties, that resolves this action without the need for further complex litigation.

Accordingly, approval of the Proposed Consent Decree satisfies the objectives of CERCLA. *See Chubb Custom Ins. Co.*, 710 F.3d at 968, 971.

////

### IV. Conclusion

For the above reasons, IT IS HEREBY ORDERED that the Motion for Approval and Entry of Consent Decree (ECF No. 43) is GRANTED, and the Consent Decree is APPROVED.

IT IS SO ORDERED.

Dated:  __February 14, 2024__

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC2 – DTSC21cv01737.consentdecree